436 N.W.2d 630 (1989)
In the Interest of R.J., D.J., B.J. and B.J., Children.
E.J., Mother, Appellant,
v.
STATE of Iowa, Appellee.
No. 87-1813.
Supreme Court of Iowa.
February 22, 1989.
Rehearing Denied March 16, 1989.
Douglas V. Coonrad, Hudson, for appellant.
Thomas J. Miller, Atty. Gen., Gordon E. Allen, Deputy Atty. Gen., and Kathrine S. Miller-Todd, Asst. Atty. Gen., for appellee.
Considered by McGIVERIN, C.J., and LAVORATO, NEUMAN, SNELL and ANDREASEN, JJ.
McGIVERIN, Chief Justice.
The mother of five children appeals from the juvenile court order terminating her parental rights with four of her children. On appeal, the mother contends that clear and convincing evidence did not exist to support the termination of her parental rights. The case was transferred to the court of appeals, which reversed the decision of the juvenile court. The State filed an application for further review. We granted the State's application and now *631 vacate the decision of the court of appeals. The judgment of the juvenile court is affirmed.
I. Background facts and proceedings. This case concerns the parental rights of a mother, Elizabeth (Beth), and four of her five children: Renda, Daniel, Brian and Brent. The children's parents were never married. Their father has never played a substantial role in their lives. His parental rights and Beth's were terminated by the juvenile court. The father did not appeal that decision.
Beth's fifth child was born during the course of these proceedings. Thus, her parental rights with respect to that child are not presently at issue.
The State's involvement with this family predates the proceedings concerning Renda, Daniel, Brian and Brent. Beth was born in 1964 and was herself adjudicated a child in need of assistance when she was age fifteen. See generally Iowa Code §§ 232.61-232.103 (1979). At that time Beth's father was in prison. Her mother, a chronic alcoholic, had abandoned and neglected Beth and her five brothers and sisters. Beth was in effect raised by an older sister in Waterloo.
For a young woman, Beth has a long history of substance abuse. Beth admits to drinking since a preteenager and use of marijuana, amphetamines, LSD and cocaine. Like her mother, however, Beth's drug of choice is alcohol. Her abuse of alcohol has proven to be the principal impediment to establishing a stable home for her children.
Renda, Beth's first child, was born in January 1981. At the time Beth was sixteen years of age. Daniel, Brian, and Brent were born in each of the succeeding years. Beth dropped out of school after completing the eighth grade. Without a high school education or a general equivalency diploma (GED), Beth supported herself and the children primarily through receipt of government assistance.
On July 20, 1985, Beth left her four children with a sixteen-year-old babysitter for the evening. A friend also left her three children in the sitter's care. The sitter was not provided with food, clean clothing, or diapers for the children. The sitter expected Beth and her friend home late that same night.
At approximately 11:00 the following night, the sitter contacted the Waterloo police because Beth had not yet returned home. The children were picked up and emergency placement was arranged with the Department of Human Services (DHS).
Brent, who at the time was eight months old, was hospitalized with a distended stomach and fever. It was determined that this condition was due to being fed from a bottle which had mold in the nipple. Brian was also hospitalized briefly with pneumonia.
The State filed a child in need of assistance petition alleging the children were neglected and denied critical care. See Iowa Code § 232.87 (1985). A temporary removal hearing was held in which it was determined the children were children in need of assistance and custody was placed with DHS. See Iowa Code § 232.95 (1985).
On the evening of July 23, 1985, Beth was informed at a party that her children had been placed in DHS custody. The following morning, four days after she had left them with a sitter, Beth contacted DHS inquiring as to the location of her children. Beth later indicated that this was not the only time that she had left her children for extended periods of time while she was out "partying."
A DHS social worker referred Beth for outpatient treatment for alcohol abuse at Northeast Council on Substance Abuse (NECSA).
In August 1985, following attempts by relatives to involuntarily commit Beth for treatment for her alcohol addiction, Beth admitted herself for inpatient treatment at the Mental Health Institute (MHI). She was discharged from the facility after less than ten days, however, because she had violated rules against sexual contact between patients. Beth resumed outpatient counseling at NECSA.
*632 On September 3, 1985, following a hearing on stipulated facts, Renda, Daniel, Brian and Brent were adjudicated by the court as children in need of assistance. See Iowa Code § 232.96. Custody of the children was continued with DHS.
On September 5, Beth entered into a social contract with DHS outlining treatment goals and programs for Beth which included obtaining a substance abuse evaluation. The contract provided Beth was to abstain from the use of alcohol. Compliance with the provisions of the contract was to facilitate a return of Beth's children to her custody.
In late September, Beth left the Waterloo area to work with a traveling carnival. She did not notify DHS that she was leaving the area and did not inform anyone as to how she could be contacted should that be necessary. Approximately one month later, Beth quit the carnival and hitchhiked back to Waterloo.
In November 1985, Beth resumed counseling through NECSA. This treatment was suspended, however, after Beth caused a disruption at a group counseling session which she attended while intoxicated.
Treatment, thereafter, was sought for Beth in an inpatient facility. She returned to MHI but was discharged the following day because Beth's mother was then undergoing treatment there and the facility had a policy against admitting more than one family member at one time. Some months went by while DHS attempted to place Beth in another facility.
In February 1986, Beth was admitted for treatment at MHI in Independence. Two weeks later, Beth was discharged due to failure to cooperate in her treatment and counseling.
Beth again resumed counseling at NECSA in March 1986.
In July, Beth was discovered to be intoxicated at a tavern by a student NECSA counselor. When confronted about this incident, Beth only offered the explanation that the student counselor was also drinking. Following this latest failure, residential or halfway house treatment was recommended for Beth.
On September 24, Beth was admitted for treatment at a Cedar Rapids halfway house operated by the Area Substance Abuse Council (ASAC). In this program Beth finally cooperated with counselors, complied with the rules she was to live under, and showed some measure of progress in understanding her addiction. While under ASAC's care Beth earned a GED.
On March 18, 1987, Beth successfully "graduated" from the ASAC program. She was then referred back to NECSA for intensive outpatient treatment which included attending Alcoholics Anonymous meetings three times weekly, taking a daily inventory of relapse signals, and continued counseling.
From March through July 1987, Beth was enrolled in various programs recommended by ASAC. Very quickly, however, her attendance became sporadic. She often missed appointments, or called to postpone or reschedule her visits with counselors. Finally, in July, Beth was dropped from the NECSA women's group because she had missed a number of sessions. By the end of the month, Beth was discharged entirely from NECSA due to her infrequent contact.
Throughout their contact with her, DHS social workers advised Beth that noncompliance with treatment and failure to gain control of her alcohol abuse may prevent her from regaining custody of her children. Despite these warnings, Beth remained unmotivated to seek meaningful treatment and continuously failed to make more than minimal efforts to better herself.
Case workers noted that Beth habitually surrounded herself with others suffering substance or alcohol abuse problems, be they family, friends or various paramours. Beth's mother, a chronic alcoholic, was known to visit Beth and the children while she was intoxicated. In July 1987, Beth's paramour, who was reported to abuse drugs and alcohol, was involved in an auto accident and arrested for operating a motor vehicle while intoxicated (OWI).
*633 Finally, on September 2, 1987, after two years of failing to achieve a stable, alcohol free environment in which to parent her children, the State filed a petition seeking a termination of Beth's parental rights. See generally Iowa Code § 232.109-.118 (1987).
While the termination proceedings were pending, Beth was arrested for her second time for operating a motor vehicle while intoxicated. At the time of her arrest, a DHS social worker was waiting at Beth's home with her four children for a scheduled visit. Beth never arrived. She was pulled over by a Waterloo police officer at 3:10 in the afternoon on October 8, 1987, while she was driving through a school zone squealing the car's tires. Beth failed a battery of field sobriety tests administered by the officer; she could not stand on one leg more than two seconds, she could not properly count her fingers; and she could recite the alphabet only as far as the letter "D".
After the officer determined that probable cause existed to make an arrest, he attempted to place Beth under arrest and direct her into the patrol car. Beth fell to the ground and resisted. At that time, the school day was ending and a number of young spectators soon gathered. Despite considerable resistance, and after what the arresting officer described as a "free for all," the officer was eventually able to get Beth inside the patrol car. There, she attempted to kick out the car's windows. She was then subdued by a second officer. A breath test was administered that indicated that Beth's alcohol concentration was 0.185. (A person commits the offense of operating while intoxicated if the person operates a motor vehicle while having an alcohol concentration of .10 or more. Iowa Code § 321J.2(1)(b) (1987).) Beth was subsequently charged with two traffic offenses, operating a motor vehicle while intoxicated (second offense), disturbing the public quiet by use of profanity, deceiving an officer, resisting arrest and assault.
Beth testified at the termination hearing before the juvenile court that the date she was arrested was the only occasion on which she drank alcohol since she was admitted to the Cedar Rapids treatment center the previous December. She blamed her relapse on the fact that DHS had broken an alleged promise to her that her children would be returned if she successfully completed the ASAC program in Cedar Rapids. Thus, when she lost hope of regaining custody of her children, Beth returned to drinking.
At the termination hearing, Beth claimed that she had not had any alcohol since the OWI arrest. It was later determined, however, that as recently as the weekend before the termination hearing, Beth was drinking with her boyfriend at her sister's home.
The children have been deeply affected by their mother's abuse of alcohol, not only with regard to their physical well being, but also in their mental and emotional affect. As noted above, when the children were first placed in DHS custody, Brian and Brent, the two youngest children, required medical attention. Additionally, it was determined that at nine months of age, Brent was only developed to a six-month-old's level. He immediately made considerable progress when placed in foster care.
In discussions concerning their mother, the children often spoke in terms of drinking, fighting and "cops". When they fought, the children would explain that they were acting like "mom and dad" or "mom and grandma". Renda, the oldest, reported on different occasions that her mother was kicked out of a bar for fighting, or was in jail, or was drinking. Renda stated that her grandmother drinks all day. Despite her age, (Renda was not yet seven years old at the time of the termination hearing), Renda is well-schooled in the vagaries of drunkenness and alcohol abuse.
On October 28, 1987, the juvenile court conducted a hearing on the State's application to terminate the parental rights of Beth and the children's father. The court heard testimony from Beth, her boyfriend, Beth's sister, and others including social workers familiar with the family. In its final order dated November 20, under the heading "findings of fact", the juvenile court stated:

*634 The children's mother, [Beth], is an alcoholic. From the time this case was first filed as a child in need of assistance case, her alcoholism has blocked the paths available to her to regain custody of her children. She has been in inpatient treatment programs; she has been in outpatient treatment programs; she has been in halfway house aftercare. None of these treatment programs has sufficiently motivated [Beth] to quit drinking.
The documentary evidence is overwhelming that as long as [Beth] continues to be an active alcoholic her children would be in danger in her home. When [Beth] drinks she has no judgment with respect to the care of her children; and the needs of her children never come before her need for alcohol.
The juvenile court ruled that it was in the children's best interests that the parental rights of Beth and the father be terminated, concluding, "These children have been waiting for more than two years for either of their parents to decide to parent them. Neither parent has demonstrated an ability to do so, and the children are in need of a permanent, safe, secure, and loving environment in which to grow." Custody of the children was placed with DHS for adoptive placement.
Beth appealed the termination of her parental rights and the matter was transferred to the court of appeals. The court of appeals reversed the juvenile court but ordered continued foster care. The court of appeals found the children continued to be children in need of assistance, but ruled Beth should be given more time to complete her test period of sobriety. The court of appeals continued custody with DHS with the possibility that a later termination proceeding may be initiated if warranted.
The State sought further review, which we granted.
II. Termination of parental rights. "This court has often recognized that there exists a parental interest in the integrity of the family unit; nonetheless we are also cognizant this interest is not absolute, but rather may be forfeited by certain parental conduct." In re Dameron, 306 N.W.2d 743, 745 (Iowa 1981). Correspondingly, the State has a duty to assure that every child within its borders receives proper care and treatment, and must intercede when parents fail to provide it. Id. "In regard to this obligation, the general assembly has carefully crafted a legislative framework for State intercession into the parent-child relationship while protecting wherever possible the integrity of the family unit." In re I.L.G.R., 433 N.W.2d 681, 689 (Iowa 1988).
Iowa Code section 232.116(5) provides that the court may order the parent-child relationship terminated if it finds that:
a. The child has been adjudicated a child in need of assistance pursuant to section 232.96; and
b. The custody of the child has been transferred from the child's parents for placement pursuant to section 232.102 for at least twelve of the last eighteen months; and
c. There is clear and convincing evidence that the child cannot be returned to the custody of the child's parents as provided in section 232.102.
It is not disputed that Renda, Daniel, Brian and Brent previously have been adjudicated to be children in need of assistance and that they have been placed in foster care for at least twelve of the last eighteen months prior to the termination hearing. Thus, we need only resolve the issue whether the State satisfied the third element of section 232.116(5) requiring clear and convincing evidence that the children could not safely be returned to their mother's care.
Iowa Code section 232.102 provides, in part:
Whenever possible the court should permit the child to remain at home with the child's parent.... Custody of the child should not be transferred unless the court finds there is clear and convincing evidence that:
. . . .
b. The child cannot be protected from some harm which would justify the adjudication *635 of the child as a child in need of assistance and an adequate placement is available.
Iowa Code § 232.102(4) (1987). "Thus, the requirement of section 232.116(5)(c) is met when there is clear and convincing evidence that conditions continue to exist to consider the child as a child in need of assistance." In re I.L.G.R., 433 N.W.2d at 690.
"Child in need of assistance" is defined, in part, as an unmarried child:
a. Whose parent ... has abandoned the child.
b. Whose parent ... has physically abused or neglected the child, or is imminently likely to physically abuse or neglect the child.
c. Who has suffered or is imminently likely to suffer harmful effects as a result of:
. . . .
(2) The failure of the child's parent ... to exercise a reasonable degree of care in supervising the child.
Iowa Code § 232.2(6) (1987). Proof by clear and convincing evidence of any one of the kinds of harm described in section 232.2(6) at the time of the termination hearing is sufficient to support termination. In re A.M.S., 419 N.W.2d 723, 725 (Iowa 1988).
In reviewing termination proceedings, we are guided by certain well settled principles:
Appellate review of the proceedings to terminate a parent-child relationship is de novo; thus "it is our duty to review the facts as well as the law and adjudicate rights anew on those propositions properly preserved and presented to us." We accord weight to the fact findings of the juvenile court, especially when considering the credibility of the witnesses who the court heard and observed first hand, but we are not bound by these findings.
Central to a determination of this nature are the best interests of the child. In this connection we look to the child's long range as well as immediate interest. Hence, we necessarily consider what the future likely holds for the child if returned to his or her parents. Insight for this determination can be gained from evidence of the parent's past performance, for that performance may be indicative of the quality of the future care that parent is capable of providing.
In re A.C., 415 N.W.2d 609, 613 (Iowa 1987) (quoting In re T.D.C., 336 N.W.2d 738, 740-41 (Iowa 1983)). Moreover, our statutory termination provisions are preventative as well as remedial. They do not require delay until after the harm has occurred. In re A.M.S., 419 N.W.2d at 726.
With these principles in mind we review the record to determine whether clear and convincing evidence exists to warrant termination of Beth's parental rights.
III. Termination of Beth's parental rights. On appeal from the judgment of the juvenile court, Beth contends clear and convincing evidence did not exist to warrant termination of her parental rights. She argues that despite her initial lack of compliance, she had recently made gains in controlling her alcohol abuse. Further, Beth asserts that the relapse that gave rise to her second OWI arrest was due to disappointment from the State's alleged broken promise that her children would be returned once she had successfully completed a substance abuse program.
A. The immediate needs of the children. Like the court of appeals, we find the children remain children in need of assistance. Unlike the court of appeals, however, we believe these children have waited long enough for their mother to rise above her debilitating dependency on alcohol. The children should be placed in a secure adoptive home as soon as possible.
Beth's circumstances resemble those in In re Dameron, 306 N.W.2d 743 (Iowa 1981). In Dameron, the parental rights of the parents of two children were terminated due to the substantial disruption that alcohol abuse had wrought upon the family. Like Beth, the Damerons minimally complied with patient efforts to treat their alcohol dependency and provide self supporting skills. Like Beth, the Damerons failed to wrest themselves from their alcohol addiction. We held in that case that clear and convincing evidence existed to *636 conclude the parents would remain unable to adequately provide for their children. Id. at 747.
Contrary to the Dameron's, Beth contends that she is making progress and should be entitled to more time before a decision relative to termination is made. As in so many other similar cases, we cannot ignore the relentless passage of time and the fact that while Beth searches for sobriety, her children languish in parentless limbo. As we stated in In re A.C., 415 N.W.2d 609, 613 (Iowa 1987):
The crucial days of childhood cannot be suspended while parents experiment with ways to face up to their own problems. Neither will childhood await the wanderings of judicial process. The child will continue to grow, either in bad or unsettled conditions or in the improved and permanent shelter which ideally, at least, follows the conclusion of a juvenile proceeding.
The court of appeals found the children were indeed children in need of assistance but ruled that more patience was warranted in order to test Beth's commitment to sobriety. The legislature has determined, however, the interval for which such patience for parents may last. See Iowa Code § 232.116(5)(b) (12 months). This period must be reasonably limited because patience on behalf of the parent can quickly translate into intolerable hardship for the children. In re A.C., 415 N.W.2d at 613.
Beth's affection for her children and her remorse for her failings do not compel a different conclusion. We do not doubt the sincerity of these feelings, but our decision must be borne upon the consideration of what is best for Renda, Daniel, Brian and Brent. Their immediate need is a secure and stable home in which to grow. Their prospects of finding such an environment in their mother's care are dismal. As we noted in a similar context:
"This is a history of good intentions, but feeble resistance to temptation and wrongdoing, and little or no consideration for the unwholesome influences created or the moral or mental welfare of these children." In these circumstances, we cannot gamble with the children's future. They must not be made to await their mother's maturity.
In re Kester, 228 N.W.2d 107, 111 (Iowa 1975) (quoting In re Morrison, 259 Iowa 301, 310-11, 144 N.W.2d 97, 102-03 (1966).)
B. The children's long range interests. We also must consider the long range interests of the children if they are returned to their mother. Their prospects in this light are dim as well. Beth's own experience bears this conclusion out.
Beth's childhood was spent in a home with alcoholic parents. Beth's father has been imprisoned, her mother has required institutionalized care. Beth began abusing alcohol as a preteenager. She ceased attending school in the eighth grade and she has been jailed on various occasions. In forecasting the needs of Beth's four children, we are mindful of the cyclical nature of Beth's condition. Beth, too, is apparently aware of this danger as her testimony at the termination hearing demonstrates:
Q: Do you, in looking back on your life, feel that you might have had a better chance had you been taken from your mother and your father when you were the age that Renda is now? A: Probably.
At the termination proceeding, the guardian ad litem for the children argued for termination of Beth's parental rights as follows:
Your honor, in the best interests of the children, I feel that [Beth's] parental rights should be terminated also.
I am fearful the pattern will repeat itself. And she certainlyBeth can certainly see what it's done to her life and that it is not a good idea for her children to be subjected to the same thing.
I don't think these are easy cases. And I don't think anybody takes any pleasure in asking for termination of parental rights. I just feel like children don't grow up in a vacuum. Beth didn't grow up in a vacuum. She is the product of a home which apparently had a lot of alcohol abuse in it. We don't make that wrong right by subjecting her children to the same type of environment. And she *637 has had many opportunities, so I think its time we give the children a chance.
Following a brief hiatus from her addiction and her seemingly successful treatment, Beth once again resumed drinking in a binge that culminated in her violent arrest. The motivation behind this episode matters little. The message that it relates is that Beth is incapable of controlling her alcohol abuse. Stated otherwise, it becomes clear that Beth's means of dealing with disappointment is to drown it.
These children, at such early ages, have already been overexposed to the ugliness of alcohol abuse. Given their mother's proclivity to continue this abuse, this exposure presents a separate threat to their long range well-being should they be returned to her care.
IV. Disposition. Beth's alcoholism severely impairs her ability to adequately parent these four children. Her debilitating condition poses an immediate as well as long range threat to the children's well-being. We hold clear and convincing evidence existed to support the juvenile court determination that Renda, Daniel, Brian and Brent continued to be children in need of assistance. Therefore, the juvenile court correctly terminated Beth's parental rights and ordered permanent adoptive placement for the children.
DECISION OF COURT OF APPEALS VACATED; DISTRICT COURT JUDGMENT AFFIRMED.