**In the Interest of J.W.D., A Minor Child; K.D., Natural Mother, and R.D., Natural Father, Appellants.**

No. 89–1709.

Court of Appeals of Iowa.

April 24, 1990.

Dirk J. Hamel of Norman, Gilloon & Wright, Dubuque, for appellant mother.

William A. Lansing, Dyersville, for appellant father.

Thomas J. Miller, Atty. Gen., Gordon E. Allen, Deputy Atty. Gen., and Judy Sheirbon, Asst. Atty. Gen. for appellee, the State.

Heard by OXBERGER, C.J., and DONIELSON and HÁBHAB, JJ.

PER CURIAM.

The child in question, J.W.D., is a boy born December 18, 1987. His parents' strained marital history includes substance abuse by the father and episodes of domestic violence between the parents. Prior to J.W.D.'s birth, his older brother, J.D., was adjudicated a child in need of assistance in February 1987. The parents' volatile relationship eventually culminated in termination of their parental rights to J.D. *In re J.D.*, No. 89–1000 (Iowa App. Jan. 25, 1990).

A CHINA petition regarding J.W.D. was filed on January 22, 1988. The petition was prompted in part by reports from neighbors regarding loud verbal exchanges between the parents and the mother's behavior in yelling and using profane language toward her young children. The petition cited J.W.D.'s poor weight gain and alleged the parents' yelling and verbal abuse which occurred in the child's presence would adversely affect his emotional condition. The petition described statements allegedly made by the mother regarding throwing J.W.D. down the stairs and putting him in a plastic bag and throwing him away. Pursuant to an emergency court order, J.W.D. was removed from his parents' home on February 1, 1988, and on March 21, 1988, he was adjudicated a child in need of assistance.

The parents underwent counseling and treatment with the Dubuque/Jackson County Mental Health Center. This treatment was terminated after four months because the parents, who initially resisted treatment, had an extremely difficult time identifying any behavioral changes they wished to make, and it was concluded any further intervention would be unsuccessful. The mother was diagnosed as mildly retarded with a schizotypal disorder. The father was diagnosed as functioning in the low average range of intelligence and having an antisocial personality disorder and an alcohol abuse problem.

During supervised visitation with their sons, the parents had further incidents of arguing and hostile behavior. During one visit in April 1989, while the mother attempted to speak to her attorney, her husband yanked the phone connection from the wall and disrupted the conversation. Statements made by the father regarding his ability to get nurses removed from the

family's case and people "wind[ing] up six feet under" were perceived as intimidating by a visiting nurse assigned to monitor the visitations.

On May 17, 1989, the mother slept during much of a scheduled visitation. When she did arise, she swore for approximately thirty minutes in the presence of J.W.D. and stated she had no interest in her third son who was born in March 1989. At times, the parents' heated arguments would cause the visiting nurses to cut visits short because of concerns for their safety and for the safety of the children.

The father continued to have a substance abuse problem, and failed to complete treatment or to even admit a problem existed. At the termination hearing, it was revealed the father had pled guilty to at least two past incidents of public intoxication and two incidents of operating a vehicle while intoxicated. Alcohol also played a role in past physical disputes the father had engaged in.

The father's excessive use of alcohol continued up to and including the time of the termination hearing. The father was uncooperative and delayed signing information release forms so the Department of Human Services could check his progress in seeking substance abuse treatment.

The father's volatile personality resulted in a physical altercation with a neighbor in March 1989 and the filing of an assault charge by the mother in August 1989. The mother was three months pregnant at the time of the August 1989 incident.

The mother's temper continued unchecked as well. During a June 1988 visitation, she became upset and destroyed a lunch she had prepared and threw it in the garbage. When Dr. Andregg explained to her what his report to the court would contain, the mother became angry and threw her plate across the room and dumped her soup in the wastepaper basket.

The parents were informed by J.W.D.'s foster mother of his allergies and dietary needs. Despite this information, his parents continued to feed J.W.D. foods to which he was allergic and from which he suffered a physical reaction. At one point during a visitation, the father questioned whether his son had any allergies and, in a mocking and somewhat threatening manner, dared his son to have an allergic reaction to a cookie he had consumed.

***Standard of Review.*** Appellate review of termination proceedings is de novo. *In re W.G.*, 349 N.W.2d 487, 491 (Iowa 1984), *cert. denied*, 469 U.S. 1222, 105 S.Ct. 1212, 84 L.Ed.2d 353 (1985). We give weight to the findings of fact of the juvenile court, especially when considering the credibility of witnesses, but we are not bound by those determinations. *Id.* at 491–92.

Iowa Code section 232.116(1)(e), relied upon as the basis for termination in the case at bar, allows termination of the parent-child relationship if:

(1) The child has been adjudicated a child in need of assistance pursuant to section 232.96;

(2) The custody of the child has been transferred from the child's parents for placement pursuant to section 232.102 for at least twelve of the last eighteen months; and

(3) There is clear and convincing evidence the child cannot be returned to the custody of the child's parents as provided in section 232.102.

The third requirement of this section is met when the child cannot be returned to the parental home because the definitional grounds of a child in need of assistance, Iowa Code § 232.2(6), exist. *In re A.M.S.*, 419 N.W.2d 723, 725 (Iowa 1988).

***Clear and Convincing Evidence.*** The witnesses before the juvenile court conceded the parents loved J.W.D. and never physically hurt him. The parents maintained a clean home and could provide adequate food, clothing, and shelter for their son. However, the parents' volatile relationship in and of itself presents a substantial risk to the well being of their son. The parents' fights alone are detrimental to J.W.D.'s emotional well being, and the arguments in this case often escalated to violent episodes which may jeopardize his safety.

The parents' interrelationship is destructive, and its potential effects upon J.W.D. cannot be ignored. Evidence was presented regarding how these parents will respond to their children as they become older and begin testing limitations and challenging their parents. Without a significant change in the parents' current mode of behavior, it is likely the parents will respond to their children as they do to others with whom they have disagreements—with hostility, aggression, and physical abuse.

J.W.D. already manifests some physical ill effects after visits with his parents that are marked with conflict and distress. The detrimental effects of the parents' relationship upon the oldest child were well documented and are set forth in an earlier decision by this court. *In re J.D.*, No. 89–1000, slip op. at 4.

Central to a determination of this nature are the best interests of the child. *In re R.J.*, 436 N.W.2d 630, 635 (Iowa 1989). In this connection, we look to the child's long-range as well as immediate interest. *Id.* Hence, we necessarily consider what the future likely holds for the child if returned to his or her parents. Insight for this determination can be gained from evidence of the parent's past performance, for that performance may be indicative of the quality of the future care that parent is capable of providing. *Id.* "[O]ur statutory termination provisions are preventative as well as remedial. They are designed to prevent probable harm to a child." *In re R.M.*, 431 N.W.2d 196, 199 (Iowa App.1988).

The resistance of these parents to counseling, their conduct subsequent to the placement of J.W.D. in foster care, and their history of repeated separations and reunifications suggests little has changed in the household. A child should not be forced to endlessly suffer the parentless limbo of foster care while awaiting the maturity of his or her parents. *Id.* at 200. Clear and convincing evidence sustains the determination that J.W.D. cannot be protected from some harm which would justify the adjudication of the child as a child in need of assistance if returned to his parents' care. The decision of the juvenile court is affirmed.

AFFIRMED.