**In the Interest of J.A.D.-F., Minor Child,**

**J.C.D., Father, Appellant.**

No. 09–1353.

Court of Appeals of Iowa.

Nov. 12, 2009.

John S. Moeller of O'Brien, Galvin & Moeller, Sioux City, for appellant father.

Robert J. Pierson of Furlong & Pierson, Sioux City, for mother.

Thomas J. Miller, Attorney General, Kathrine S. Miller–Todd, Assistant Attorney General, Patrick Jennings, County Attorney, and Diane Richardson, Assistant County Attorney, for appellee State.

Joseph Kertels, Sioux City, for minor child.

Considered by VOGEL, P.J., and DOYLE and MANSFIELD, JJ.

DOYLE, J.

A father appeals from the order terminating his parental rights. Upon our de novo review, we affirm.

## I. Background Facts and Proceedings.

J.C.D. is the father and A.L.E. is mother of J.A.D.-F., born July 1997.[1] The mother gave care of the child to the father when the child was approximately one and a half years old. Thereafter, the father was awarded custody of the child, and the mother had little contact with the child.

The child came to the attention of the Iowa Department of Human Services (Department) in July 2008 following an incident with his father. It was reported that the father had begun drinking at 10:30 a.m. that day and continued to drink throughout the day. In the early evening, the child asked the father if he could go to the child's adult brother's home and the father agreed. The child called the brother and asked if he could visit him because the father was intoxicated; the brother agreed and picked the child up. Thereafter, the father called the brother several times to have the child returned home. Due to the father's state of intoxication, the brother tried to persuade the father to allow the child to stay with him. The father initially agreed, but later called back to again ask that the child be returned home. The father then drove to the brother's home to pick up the child, and the father was arrested for operating while intoxicated. The father's preliminary breath test indicated the father's blood alcohol concentration was about .257. It was reported that the father was participating in an outpatient treatment program at the time due to his issues with alcohol. The child reported that the father drank every day. The child also reported that the child was made to ride with the father when the father drove while intoxicated.

The father reported to the Department that he began drinking when he was eighteen years of age and that his usage increased gradually. He has several alcohol related arrests. In February 2008, the

---

1. This appeal concerns only the father's parental rights. The child's mother has not appealed from the termination of her parental rights.

father's employer placed him on a thirty-day leave of absence after he came to work smelling of alcohol. He successfully completed an inpatient substance abuse program after the work incident, but he was ultimately discharged by his employer. The father admitted he immediately began drinking again after his discharge. He was arrested for public intoxication in May 2008, and his brothers and adult child initiated involuntary substance abuse commitment procedures on his behalf. He returned home after five days and entered another outpatient program. He admitted that he continued to drink thereafter.

On September 15, 2008, the State filed its petition alleging the child to be a child in need of assistance (CINA). On October 3, 2008, the child was removed from the father's care after the mother presented a fraudulent court order for the child's removal. When authorities learned the order was fraudulent, a valid removal order was issued by the juvenile court concerning the father on October 5, 2008, finding the child was in imminent danger under the care of a parent who was abusing alcohol. The valid removal order placed the child into relative care with the paternal aunt and her husband. The child has resided with the aunt since that time and has thrived in her and her husband's care.

On October 16, 2008, the court adjudicated the child CINA. In October of 2008, the father's outpatient treatment program reported that his attendance was sporadic, but noted he was doing much better about participating in group. However, the father continued to drink. In November, the father's siblings again sought that the father be involuntarily committed due to his drinking, and the father entered an inpatient treatment program. The father was discharged in December, and his counselor opined that the father's prognosis was poor but could improve if he followed recommendations.

Following a dispositional hearing in December 2008, the court entered its order finding that the father purchased alcohol the same day he was discharged from the inpatient treatment program. The court further found that it was recommended that the father enter a halfway house program, but the father was uncertain as to whether or not he would follow through with the recommendation, claiming that he would be able to maintain his sobriety on an outpatient status. The court continued the child's placement with the aunt.

The father then began outpatient treatment again in January 2009. It appeared the father was progressing in treatment, but it was reported that he continued to abuse alcohol. It was reported that the father was drinking again in March and had threatened service providers. On March 31, 2009, the father's therapist recommended that the father be again placed in inpatient treatment as soon as possible due to the father being a threat to himself and possibly others because of his continued alcohol use.

In April, the father was back in outpatient treatment. The father re-entered inpatient treatment on May 27, 2009, although he was resistant to it. The father was intoxicated at the time of his inpatient admission. Although he successfully completed all the necessary steps for inpatient treatment, the father's therapist found that the father did not put forth much effort in his treatment until his final three days there. The therapist recommended that the father return to intensive outpatient treatment until he was able to enter a halfway house. It was also recommended that the father abstain from all mood-

altering substances and attend at least two AA/NA meetings each week.

On June 3, 2009, the court entered its permanency order following a hearing. The court found that the father had continued to abuse alcohol since entry of the dispositional order. The court found that the father had been in inpatient treatment twice since January 2008, and that after completing the programs, he immediately returned to drinking on nearly a daily basis. The court also found that the father had not had any regular visits with the child since February due to the father's ongoing drinking, noncompliance, and threatening demeanor. The court noted that the father had placed several harassing phone calls to the case manager and service providers since the last court hearing. The court ordered that termination of parental rights proceedings be initiated.

It was reported that the father continued to drink in July. On July 14, 2009, the State filed its petition for the termination of the father's parental rights. A contested hearing was held on August 24, 2009. A report from the child's social worker was entered into evidence. The worker stated she had taught the child some coping skills and other ways to deal with issues revolving around the father, including recognizing that the father's addiction to alcohol was not the child's fault. The child reported to the worker that the child worries about the father and that the father's alcoholism was the biggest problem in their family. The child verbalized that the child understood living with the aunt was a much better environment for the child, although getting used to having rules, expectations, and chores was and would continue to be a big adjustment for the child. The child reported that the child previously had to take care of the father, and that the child did a lot of laundry, dishes, and picking up the house when the father was unable to do so. The child told the worker that the child wanted the child's family to be normal, explaining that normal would be the child living with the aunt, the father not drinking, and everyone getting along with one another.

The father testified at the hearing that he relapsed early in July 2009, but had remained sober since. The father submitted a progress update from his therapist, stating that the father had reported his relapse but he continued to participate in outpatient treatment on a regular basis and was sober. The report stated that the father was setting boundaries with old alcohol-using friends, and was attending two to three AA meetings a week. The father admitted that twice it had been recommended that he move into a halfway house, but he did not follow the recommendation because he was not employed and unable to pay for the service. The father admitted he did not ask family members to help him pay to reside at the halfway house. The father admitted that the child made significant progress with regard to the child's social skills, academic performance, and coping skills since being placed with the aunt. The father also admitted the aunt would allow the father to continue to have contact with the child if his rights were terminated, as long as the father was sober. The case worker testified she had concerns that the father was still drinking at the time of the termination hearing. The child's guardian ad litem and attorney recommended that the father's parental rights be terminated, explaining:

I've talked to [the child] on several occasions about the recommendations today and the recommendations in the past.

[The child] tells me [the child would] be okay with the adoption.

My main concern is ... [the child's] health, you know. At [the child's] age, ... [the child] needs not to be worried about [the father] so much. [The child] doesn't need to be worried about [the child's] home life. [The child] needs to have a good environment.

Since [the child has] been with [the] aunt and uncle, [the child's] been having an excellent environment for [the child]. [The child] still worries about [the father], but I believe the termination and adoption's going to give [the child] more permanency; it's going to give [the child] a place where [the child] knows [the child's] going to be there, you know, [until the child] graduates from high school....

On August 26, 2009, the juvenile court entered an order terminating the father's parental rights to the child pursuant to Iowa Code section 232.116(1)(d) (2009) (child CINA for abuse or neglect, circumstances continue despite receipt of services), (i) (child meets definition of CINA, child was in imminent danger, services would not correct conditions), and (l) (child CINA, parent has substance abuse problem, child cannot be returned within a reasonable time). The father now appeals.

## II. Scope and Standards of Review.

■ We review termination proceedings de novo. *In re R.E.K.F.*, 698 N.W.2d 147, 149 (Iowa 2005). Although we give weight to the juvenile court's findings of fact, we are not bound by them. *In re K.N.*, 625 N.W.2d 731, 733 (Iowa 2001). The grounds for termination must be supported by clear and convincing evidence. *In re T.B.*, 604 N.W.2d 660, 661 (Iowa

2000). Evidence is clear and convincing when it leaves "no serious or substantial doubt about the correctness of the conclusion drawn from it." *In re D.D.*, 653 N.W.2d 359, 361 (Iowa 2002). Our primary concern in termination cases is the best interests of the child. *In re A.S.*, 743 N.W.2d 865, 867 (Iowa Ct.App.2007).

## III. Discussion.

■ The rules governing appeals in CINA and termination of parental rights cases employ expedited procedures. "The petition itself is a streamlined, fill-in-the-blanks form, designed to be completed in an expeditious manner." *In re L.M.*, 654 N.W.2d 502, 506 (Iowa 2002). Iowa Rule of Appellate Procedure 6.201(1)(*d*) provides that the petition on appeal shall substantially comply with Form 5 in rule 6.1401. Paragraph 8 of Form 5 requires a petitioner to "State the legal issues presented for appeal, including a statement of how the issues arose and how they were preserved for appeal." Iowa R.App. P. 6.1401—Form 5. The form further provides:

*The issue statement should be concise in nature setting forth specific legal questions. General conclusions, such as "the trial court's ruling is not supported by law or the facts," are not acceptable. Include supporting legal authority for each issue raised, including authority contrary to appellant's case, if known.*

(Emphasis in original.) "[C]ounsel is not expected to exhaustively review the evidence at trial, nor must counsel cite to the record to demonstrate error." *L.M.*, 654 N.W.2d at 506. "The petition is limited in content and directs the appellant to raise issues for appeal rather than arguing issues in a full appellate brief." *In re R.K.*, 649 N.W.2d 18, 21 (Iowa Ct.App.2002).

"[W]hile the appellate procedure under the ... rules is streamlined, the reviewing court's ability to thoroughly appraise the legality of the termination is not compromised." *In re C.M.*, 652 N.W.2d 204, 211 (Iowa 2002). Our de novo review requires us "to review the facts as well as the law and adjudicate rights anew on those propositions properly preserved and presented to us." *In re R.J.*, 436 N.W.2d 630, 635 (Iowa 1989) (citations omitted).

For each issue raised by the father, he merely states the State failed to meet its burden of proof by a showing of clear and convincing evidence, and he cites only to those Iowa Code sections relied on by the juvenile court for termination. Other than his general conclusory statements, the father makes no argument and cites no case law. This is little more than saying, "I appeal." With precious little guidance, this court is essentially forced to divine what the father believes supports the issues he raises. By this notation, we make no suggestion that the father's counsel was deficient in any way as the practice of not providing an argument is not atypical and not in violation of the letter of the rules, particularly in light of the above-cited pronouncements. And, we give his appeal a de novo review with thorough appraisal of the legality of the termination.

Although Form 5 does not specifically require an argument, the rules give an appellant "a full opportunity to identify issues for review." *C.M.*, 652 N.W.2d at 211. Some argument, some support for the issues raised, some showing as to how the State failed to carry its burden of proof and where we should focus our review would be helpful to the court. Practitioners routinely make closing arguments and post-trial motions without the benefit of a transcript. Similarly, arguments, albeit abbreviated, could be employed in termination appeals.[2]

■ On appeal, the father claims the State failed to establish by clear and convincing evidence grounds for termination. Although the juvenile court terminated the father's parental rights on three statutory grounds, we need only find that termination is appropriate on one ground to affirm. *In re S.R.*, 600 N.W.2d 63, 64 (Iowa Ct.App.1999).

Upon our de novo review of the record, we find clear and convincing evidence supports termination of the father's parental rights under Iowa Code section 232.116(1)(*l*). The child has been adjudicated a CINA and removed from the father's physical custody. *See* Iowa Code § 232.116(1)(*l*)(1). The father has a severe, chronic substance abuse problem and presents a danger to himself, as evidenced by his frequent committals and inpatient treatments. *See id.* § 232.116(1)(*l*)(2).

Additionally, there is clear and convincing evidence the child will not be able to return to the father's custody within a reasonable period of time considering the child's age and need for a permanent home. *See id.* § 232.116(1)(*l*)(3). We commend the recent progress the father has made in attempting to overcome his long-standing abuse of alcohol, but it is far too early to have any confidence that the father will be able to maintain sobriety and his commitment to change.

[A] good prediction of the future conduct of a parent is to look at the past conduct. Thus, in considering the impact of a

---

**2.** In making this suggestion, we are mindful of the challenges faced by appointed counsel and the obligations imposed by Iowa R.App. P. 6.201(1)(*a*).

drug addiction, we must consider the treatment history of the parent to gauge the likelihood the parent will be in a position to parent the child in the foreseeable future. Where the parent has been unable to rise above the addiction and experience sustained sobriety in a noncustodial setting, and establish the essential support system to maintain sobriety, there is little hope of success in parenting.

*In re N.F.,* 579 N.W.2d 338, 341 (Iowa Ct.App.1998) (citations omitted). We are sympathetic to the father's struggle to maintain sobriety, and recognize that many are able to successfully free themselves from the tenacious grip of addiction. Yet the interests in permanency for the child must prevail over the father's long and uncertain battle with alcohol. *See id.* We have repeatedly followed the principle that the statutory time line must be followed and a child should not be forced to wait for the parent to overcome their addiction. *Id.* The father's frequent relapses during the pendency of this case evidence that the child will not be able to return to the father's custody within a reasonable period of time considering the child's age and need for a permanent home.

■ Furthermore, the record reveals that termination is in the child's best interests. "A child's safety and the need for a permanent home are now the primary concerns when determining a child's best interests." *In re J.E.,* 723 N.W.2d 793, 801 (Iowa 2006) (Cady, J., concurring specially). Those best interests are to be determined by looking at the child's long-range as well as immediate interests. *In re C.K.,* 558 N.W.2d 170, 172 (Iowa 1997). We are to consider what the future likely holds for the child if the child is returned to the child's parent. *In re J.K.,* 495 N.W.2d 108, 110 (Iowa 1993). Insight for that determination is to be gained from evidence of the parent's past performance, for that performance may be indicative of the quality of the future care that the parent is capable of providing. *In re L.L.,* 459 N.W.2d 489, 493–94 (Iowa 1990); *In re Dameron,* 306 N.W.2d 743, 745 (Iowa 1981).

Here, the evidence establishes that the child will not be able to return to the father's custody within a reasonable period. Additionally, the evidence at trial established that the child is in need of permanency, and the child should not have to wait any longer. *In re A.C.,* 415 N.W.2d 609, 613 (Iowa 1987) ("[P]atience with parents can soon translate into intolerable hardship for their children."). "At some point, the rights and needs of the child rise above the rights and needs of the parents." *In re J.L.W.,* 570 N.W.2d 778, 781 (Iowa Ct.App.1997). The child is doing very well in the care of the aunt and her husband. The child's grades have improved substantially, and the child appears to be truly happy. The aunt and her husband wish to adopt the child, and the child is agreeable to the adoption. For all of these reasons, we conclude the district court did not err in terminating the father's parental rights.

**AFFIRMED.**