# IN THE COURT OF APPEALS OF IOWA

No. 18-1873
Filed March 6, 2019

**IN THE INTEREST OF J.D., J.D., and J.D.,**
**Minor Children,**

**K.C., Mother,**
    Appellant.

_____

Appeal from the Iowa District Court for Osceola County, David C. Larson, District Associate Judge.

A mother appeals the termination of her parental rights to her three children. **AFFIRMED.**

Scott A. Johnson of Hemphill Law Office, PLC, Spencer, for appellant mother.

Thomas J. Miller, Attorney General, and Anagha Dixit, Assistant Attorney General, for appellee State.

Tisha M. Halverson of Klay, Veldhuizen, Bindner, DeJong & Halverson P.L.C., Paullina, for appellee father.

Shannon Sandy of Sandy Law Firm, Spirit Lake, guardian ad litem for minor children.

Considered by Doyle, P.J., and Mullins and McDonald, JJ.

**DOYLE, Presiding Judge.**

A mother appeals the termination of her parental rights to her children. She challenges the sufficiency of the evidence supporting the grounds for termination and argues the State failed to make reasonable efforts to reunify the family. She requests additional time to prove the children can be returned to her care.

**I. Background Facts and Proceedings.**

This appeal concerns three children: J.L.D., who was born in 2009; J.M.D., who was born in 2010; and J.B.D., who was born in 2013. Documented concerns about the children's safety extend as far back as 2012, when the family lived in Minnesota. Specifically, the mother allowed her boyfriend—J.B.D.'s father—to discipline J.L.D., and in October 2012, the boyfriend hit J.L.D. hard enough to cause bruising and cuts. This was not the first time J.L.D was injured by a man the mother was in a relationship with; less than a year earlier, J.L.D. was injured when the mother's ex-fiancé threw J.L.D. into bed. J.L.D. and J.M.D. had also observed incidents of domestic violence between the mother and her then-boyfriend, whose criminal history included convictions for possession of controlled substances, assaults, and criminal sexual conduct. There were concerns about the mother's stability, as she changed addresses thirteen times in five years and the children having at least four different daycare providers in a six-month period. Because of these concerns, a Minnesota court removed J.L.D. and J.M.D. from the mother's care and adjudicated them to be in need of protection or services. *See* Minn. Stat. § 260C.007, subd. 6(8) (2013) (defining "[c]hild in need of protection or services" as "a child who is in need of protection or services because the child . . . is without proper parental care because of the emotional, mental, or

physical disability, or state of immaturity of the child's parent, guardian, or other custodian"). J.L.D and J.M.D. were returned to the mother's care in March 2014 following a trial home placement,[1] and the child-in-need-of-protection-or-services petition was dismissed.

The mother and children moved to Iowa in 2014. In 2015 and 2016, the Iowa Department of Human Services (DHS) received allegations that the mother failed to provide the children with medication as prescribed, failed to supervise the children adequately, and drove while intoxicated with one child in the car. It was also alleged that J.B.D.'s father assaulted the mother in front of J.B.D. Although allegations that the mother denied the children critical care were not confirmed, the DHS worker who performed a child protective assessment in May 2016 "determined that there are sufficient health and safety issues with regard to this family" and recommended that J.L.D. be adjudicated a child in need of assistance (CINA). The worker noted concerns about J.L.D.'s behaviors, especially his physical aggression toward his siblings and other children. The State filed a CINA petition concerning J.L.D. Following an uncontested hearing, the juvenile court adjudicated J.L.D. to be a CINA and ordered J.L.D. to remain in the mother's custody.

In spite of juvenile court and DHS involvement, concerns about the children's safety persisted. A protective assessment found the mother denied the children critical care in August 2016 by failing to provide proper supervision and allowing a registered sex offender access to the children. The children struggled

---

[1] The mother gave birth to J.B.D. after the adjudication of J.L.D. and J.M.D. as children in need of protection or services but before the trial home placement.

in school. The mother was not consistent in giving J.L.D. his medications or in following through with the services offered by the DHS. The DHS learned the mother was in a new relationship[2] when the police responded to a call about a domestic disturbance at her residence in October 2016 while the children were present.

In January 2017, the State petitioned to adjudicate J.M.D. and J.B.D. to be CINA and remove them from the home. The State also moved to modify J.L.D.'s disposition to place him in foster care. Before the hearings on those matters and without notice to the DHS, the mother placed the children with relatives: J.L.D. was placed with his grandfather in Orange City, J.M.D. was placed with his father in Minnesota, and J.B.D. was placed with a great aunt in Iowa Falls (before being moved to the home of the great aunt's daughter). In February 2017, the juvenile court granted the State's petition to adjudicate J.M.D. and J.B.D. to be CINA and modified J.L.D.'s disposition. The court ordered the children to the custody of the DHS, which continued the children in their relative placements.[3] In the months that followed, the mother considered voluntarily terminating her parental rights to her children.

The mother moved to South Dakota in May 2017. The move placed her farther away from the children. At the request of the DHS, the South Dakota Department of Social Services completed a home study of the mother's residence, which recommended the family follow through on individual and family therapy and

---

[2] The mother became engaged to the man that December 2016 and married him in August 2017.

[3] J.L.D. was moved to a foster home in Spencer in June 2017, where he has remained.

that the mother request another home study after she demonstrated consistency and stability for a longer period.

In July 2017, the mother obtained a psychological evaluation. The evaluator noted that the mother minimizes or denies having difficulties, which prevents her from improving her parenting skills, and she would need to acknowledge her shortcomings in order to provide a safe and stable home for the children. Based on the mother's past choices or limited understanding of her children's needs, the evaluator opined that the mother would likely need two to five years of therapeutic services to regain trust and reestablish relationships with the children. The evaluator also noted that the mother's "current desire for her children to return to her care revolve[s] around having the new support system of her fiancé and the stability this can provide." However, the evaluator cautioned that the support of a spouse would not be enough for the mother to maintain healthy relationships and make healthy choices for herself and her children. "This concept may not be readily accepted by the [mother], and would need therapeutic intervention, as it appears the [mother] has limited insight into how this notion may be influencing her decision making."

In an October 2017 order, the juvenile court found the mother's compliance with court-ordered services to be lacking. It found the mother had "boycotted" two family team meetings in a six-month period and "been hesitantly and belatedly compliant" in completing a psychological evaluation. With regard to the requirement that the mother participate in individual therapy, the court found that she complied for only a short time before making excuses as to why she was unable to participate. The court also found the mother failed to follow through with

the court-ordered psychiatric evaluation and any recommendations made from it because "she does not want to do so and because she does not believe she needs medication management." With regard to visitation with the children, the court noted that although she was offered weekly visits with J.L.D. and J.B.D., she generally "exercises the visits approximately two times each month." The mother had only seen J.M.D. twice since removal, and although the court attributed fault to both the mother and J.M.D.'s father, the court noted that the mother "has not actually made any effort to travel to [the father's town] to exercise any visitation." The court cautioned, "[I]t is imperative that [the mother] make her scheduled visits with the children a priority. It will be impossible to improve her bond with the children with only sporadic participation in visitation, whether it be in person or by phone or video." Finally, the court noted:

> [I]t will be more feasible to expand visits, hopefully eventually to unsupervised, if [the mother] curbs her hostility toward service providers and actually focuses on cooperating with the services being offered. [The mother] had all good things to say about [one worker]. With that exception, she accuses almost all other providers to be conspiring against her reunification with the children. She has found the motivation and time to make complaints to the DHS director and to the state ombudsman, but yet cannot find the resources to learn the name of the children's schools and make contact with teachers. She cannot find the time to fully participate in services, but she is able to be sure she records over 1000 telephone calls on her cell phone. She alleges, with absolutely no proof, that DHS is only keeping this case open for a paycheck. She claims [the DHS caseworker]'s motivation is to keep the kids away from her and not to help toward reunification. She believes that [the FSRP worker] is "in cahoots" with [the caseworker]. According to [the mother], even the independent third-party psychological evaluator is controlled by [the caseworker]. In [the mother]'s mind, it is the foster parent's responsibility to share names of teachers, not the parent's responsibility to seek out this information. She avers it is solely the fault of [the father] and his parents that she has almost no visitation with J.M.B. She blames DHS for the burden she bears in visiting her children, but it was she who originally placed the children at great

distance from her residence. She subsequently increased that burden by moving even further from the children when she relocated to [South Dakota]. While [the mother] testified at hearing that she has taken responsibility for her actions in this case, these few examples show that she actually has not. Also, while [the mother] testified that she would do whatever it takes to get her children returned, that, too, is not true as evidenced by her unwillingness or delays in obtaining the psychological evaluation, participating in individual therapy, obtaining a psychiatric evaluation and cooperating with medication management, and fully engaging in family team meetings.

Little changed following the October 2017 order. The DHS suspended the mother's in-person visits with J.L.D. after J.L.D. became physically violent toward her during a visit in early October 2017. Although the DHS attempted to facilitate phone visits between J.L.D. and the mother, J.L.D. refused to talk to her. In late November 2017, the mother caused J.L.D. distress by showing up at his school unannounced and telling him that he needed to attend visits.

The mother began attending therapy in October 2017. She attended nine therapy sessions before she was involved in a motor vehicle collision in December 2017, which prevented the mother from traveling "for extended periods of time on her own." The mother's therapy sessions were then reduced to one per month, though in April 2018, the mother and her therapist agreed to remain in contact through email until she was able to attend her weekly therapy sessions again. The car collision also prevented the mother from attending visits with J.B.D. Although the DHS attempted to accommodate her travel restrictions, the mother reported that the accommodations were insufficient. The DHS asked the mother for an update or clarification on her restrictions, but she never provided one. The mother testified at the termination hearing that her doctor would be reevaluating her travel restrictions on July 31, 2018.

The State filed a petition to terminate the mother's parental rights in December 2017. On March 23, 2018, the mother moved the court to increase the amount of visitation with her children. Specifically, the mother requested telephone visitation with all three children and that the DHS assist in transporting the children to a location within her driving restrictions. The juvenile court denied the motion on July 3, 2018, noting that J.L.D.'s and J.M.D.'s therapists recommended that any contact with the mother occur in parent-child interactive therapy (PCIT) due to the increase in the children's negative behaviors following contact with the mother. Although the court stated that the children's caregivers should continue to encourage telephone contact "as directed by the children's therapists," it found that forcing telephone contact on J.L.D. or J.M.D. if they opposed it was not in their best interests. The court also observed that distance remained a barrier to any in-person visitation, primarily due to the mother's travel restrictions, which were not the fault of either the mother or the DHS.

On August 21, 2018, following the completion of the termination hearing, the mother moved the court to order the DHS "to facilitate the transportation" of J.B.D. to a PCIT session she scheduled in Spencer. In its resistance to the motion, the State noted that the mother had failed to clarify or verify the nature of her travel restrictions. The State also noted that due to the distance involved, complying with the mother's request would cause J.B.M. to miss the majority of one school day per week.

On October 10, 2018, the juvenile court entered an order terminating the mother's parental rights to all three children pursuant to Iowa Code section

232.116(1)(f) (2017). The order denied the mother's motion for additional visitation on that basis. The mother appeals.

**II. Discussion.**

We review the termination of parental rights de novo. *See In re A*.S., 906 N.W.2d 467, 472 (Iowa 2018). Although the juvenile court's findings of fact are not binding, we give them weight, especially in assessing the credibility of witnesses. *See id.*

**A. Grounds for termination.**

The mother first challenges the sufficiency of the evidence supporting the grounds for terminating her parental rights. In order to terminate parental rights under section 232.116(1)(f), clear and convincing evidence must establish the following:

> (1) The child is four years of age or older.
> (2) The child has been adjudicated a child in need of assistance pursuant to section 232.96.
> (3) The child has been removed from the physical custody of the child's parents for at least twelve of the last eighteen months, or for the last twelve consecutive months and any trial period at home has been less than thirty days.
> (4) There is clear and convincing evidence that at the present time the child cannot be returned to the custody of the child's parents as provided in section 232.102.

The mother does not dispute proof of the first three elements under this section. She instead contends the State failed to prove that at the time of the termination hearing, the children could not be returned to her custody as provided in section 232.102. *See id.* § 232.116(1)(f)(4); *In re D.W.*, 791 N.W.2d 703, 707 (Iowa 2010) (interpreting the term "at the present time" to mean to mean "at the time of the termination hearing"). "[A] child cannot be returned to the custody of the child's

parent under section 232.102 if by doing so the child would be exposed to any harm amounting to a new child in need of assistance adjudication." *In re M.S.*, 889 N.W.2d 675, 680 (Iowa Ct. App. 2016) (alteration in original) (citation omitted). The State bears the burden of establishing a nexus between a parent's conduct and an appreciable risk of adjudicatory harm to the child. *See id.* at 682.

The juvenile court determined that returning any of the children to the mother's care would expose the child to harm amounting to a CINA adjudication pursuant to section 232.2(6)(c)(2). A CINA adjudication may occur under this section if a child has suffered or is imminently likely to suffer "harmful effects" as a result of the parent's failure "to exercise a reasonable degree of care in supervising the child." Iowa Code § 232.2(6)(c)(2).

> Although chapter 232 does not contain a definition of 'harmful effects,' we have noted it 'pertains to the physical, mental or social welfare of a child.' Because of this broad definition, we have found such effects established when there was harm to a child's physical, mental, or social well-being or such harm was imminently likely to occur.

*In re J.S.*, 846 N.W.2d 36, 41-42 (Iowa 2014) (citation omitted).

Our supreme court has found clear and convincing evidence that children have suffered harmful effects as a result of their parents' failure to exercise a reasonable degree of care in supervising the children under circumstances similar to those before us. *In re J.S.*, 427 N.W.2d 162, 165 (Iowa 1988) (finding clear and convincing evidence based on parents' lack of supervision or poor supervision of the children, which resulted in the children's "lack of control and discipline" and "very aggressive and uncontrollable" behavior in the home, which improved under foster care). Although the record is replete with evidence of the mother's failure to

supervise the children and the harm it presents to all three children, it is most significant with regard to J.L.D., the oldest of the children. J.L.D. observed "altercations between his parents and their significant others, and has been exposed to acts of aggression and violence." The mother reportedly allowed J.L.D. to "do whatever he wanted" and "never showed [him] how to interact with others appropriately." In 2015, J.L.D. was diagnosed with reactive attachment disorder, which occurs when a child under the age of three is severely abused or neglected by a parent and unable to form an attachment relationship with that figure. The report of J.L.D.'s psychological evaluation indicates that he exhibits symptoms consistent with a history of trauma and neglect. J.L.D.'s therapist made similar findings, observing that J.L.D. "exhibits numerous indicators of attachment trauma, which means he experienced neglect/physical abuse by parent, witnessing domestic violence, and loss or removal from parent followed by foster care."

Clear and convincing evidence shows the mother's neglect has already damaged J.L.D.'s well-being. A social investigation report completed before the CINA adjudication described J.L.D.'s "severe aggression": "He talked about killing often, and would push [J.B.D.] on purpose. [The mother] reports [J.L.D.] was kicked out of school and daycare at the end of May. Daycare said they couldn't handle him from day one as he was swearing, spitting, and punching." The report of J.L.D.'s psychological evaluation notes that he "experiences nightmares, avoidance of external reminders, distorted cognitions, hypervigilance, and an exaggerated startle response, all following the traumatic and life threatening experiences prior to being placed in foster care." The evaluator also found J.L.D.'s defiant and aggressive behavior—which included bullying of female peers, temper

outbursts, irritability, anger and resentment, arguing with adults, annoying others, apathy, and difficulty respecting others—was clinically significant. J.L.D.'s therapist noted the "many indicators of significant distress" observed in his diagnostic interview:

> He was unable to draw a picture of a human person, self or family. He was unable to recall a happy memory or a "best thing that ever happened to me," other than his placement with [his foster mother]. His three wishes were: 1) "To hit my mom and kick her in the face (2) put fire ants in her (my mom's) mouth (3) Be listening (to my teacher) every day." He is highly negative, reactive, and resistant when discussing his mother.

J.L.D.'s therapist further noted that J.L.D. "expresses hatred and malice towards his mother and [her husband] nearly every therapy session."

The record here sufficiently establishes that imminent harm would likely occur to J.L.D.'s physical, mental, or social well-being if he was returned to the mother's custody. J.L.D.'s therapist found he "is unable to tolerate thoughts or reminders of his mother" and that contact with his mother before he was ready would exacerbate his symptoms and delay his recovery. Additionally, the report of J.L.D.'s psychological evaluation states that J.L.D. "will do best with strict boundaries which are consistently reinforced." J.L.D.'s therapist agreed that he "will do best in a stable, structured and loving environment with a great deal of individual adult attention." Given the mother's limited participation in the services to date and her need to engage in therapy for a significantly longer period of time to earn the children's trust and rebuild a relationship, clear and convincing evidence establishes that the mother is unable to provide J.L.D. with the consistency and stability he needs. Although J.L.D. still struggles with the effects of the trauma inflicted by his mother's neglect and will need treatment for an

extended period of time, his behavior has improved since his removal from the mother's care and his placement in foster care.

Although the effects of past trauma is less dramatic with J.M.D. and J.B.D., clear and convincing evidence also establishes that imminent harm would be likely to occur to their physical, mental, or social well-being if returned to the mother's custody. J.M.D. witnessed domestic violence between the mother and J.B.D.'s father, which led to her removal from the home in Minnesota. The record shows that the mother permitted J.M.D. to attend school dirty and disheveled, failed to intervene when her siblings were assaulting her, and blamed J.L.D. and J.B.D.'s behaviors on her. J.M.D. reported she did not feel safe while living with the mother. The evidence indicates J.B.D. lacks a bond with his mother and has demonstrated negative behaviors after his visits with her. If J.M.D. and J.B.D. were returned to the mother's care, both children would be at risk for the same harm that J.L.D. has experienced.

Clear and convincing evidence establishes the grounds for terminating the mother's parental rights pursuant to Iowa Code section 232.116(1)(f).

**B. Reasonable efforts.**

The mother also challenges the sufficiency of the services offered to reunify the family. Specifically, she argues that after her December 2017 car collision injuries, the DHS failed to facilitate visitation at a location that fell within her travel restrictions.

Iowa law requires the DHS to "make every reasonable effort to return the child to the child's home as quickly as possible consistent with the best interests of the child." Iowa Code § 232.102(9). The requirement "is not viewed as a strict

substantive requirement of termination" but rather "impacts the burden of proving those elements of termination which require reunification efforts." *In re C.B.*, 611 N.W.2d 489, 493 (Iowa 2000).

Although the State has an obligation to make reasonable efforts toward reunification of the family, "a parent has an equal obligation to demand other, different, or additional services prior to a permanency or termination hearing." *In re A.A.G.*, 708 N.W.2d 85, 91 (Iowa Ct. App. 2005).

> In general, if a parent fails to request other services at the proper time, the parent waives the issue and may not later challenge it at the termination proceeding. If a parent has a complaint regarding services, the parent must make such challenge at the removal, when the case permanency plan is entered, or at later review hearings. Moreover, voicing complaints regarding the adequacy of services to a social worker is not sufficient. A parent must inform the juvenile court of such challenge.

*In re C.H.*, 652 N.W.2d 144, 148 (Iowa 2002) (citations omitted). Here, the mother first petitioned the court for additional visitation months after the termination petition had been filed. Her second motion for additional visitation was filed after the termination proceedings commenced. These challenges to the reasonable-efforts requirement came too late.

Even assuming that the mother preserved error on her request for additional visitation, we are unable to conclude the State failed to make reasonable efforts here. The mother claims her travel restrictions prevented her from visiting her children. The record shows that prior to the car collision and the imposition of the travel restrictions, the mother only attended visits with J.L.D. and J.B.D. twice per month. The mother only saw J.M.D. twice in the year leading up to her accident. Although the children live a great distance from the mother, the mother chose the

children's placements and then chose to increase the distance by moving out of state. Finally, the record shows that each child's therapist expressed concern that visits with the mother were contrary to the child's best interests. The efforts made by the State to reunify the family were reasonable. The mother's failure to take advantage of those services resulted in the termination of her parental rights.

**C. Additional time.**

Finally, the mother asks for additional time to reunify with the children. *See* Iowa Code § 232.104(2)(b) (allowing the court to continue placement of the child for an additional six months if it is determined "that the need for removal of the child from the child's home will no longer exist at the end of the additional six-month period"). However, delaying permanency is not in the child's best interests. Children are not equipped with pause buttons, and delaying their permanency in favor of the parents is contrary to the children's best interests. *See In re A.M.*, 843 N.W.2d 100, 112 (2014) (noting children must not be deprived permanency on the hope that someday the parent will be able to provide a stable home); *In re A.C.*, 415 N.W.2d 609, 614 (Iowa 1987). Once the grounds for termination have been proved, time is of the essence. *See A.C.*, 415 N.W.2d at 614 ("It is unnecessary to take from the children's future any more than is demanded by statute. Stated otherwise, plans which extend the [statutory] period during which parents attempt to become adequate in parenting skills should be viewed with a sense of urgency."); *see also In re R.J.*, 436 N.W.2d 630, 636 (Iowa 1989) (noting that once the time period for reunification set by the legislature has expired, "patience on behalf of the parent can quickly translate into intolerable hardship for the children").

We decline to delay the children's permanency by granting the mother additional time.

**AFFIRMED.**