# IN THE COURT OF APPEALS OF IOWA

No. 15-0764
Filed August 19, 2015

**IN THE INTEREST OF H.J.,**
     **Minor Child,**

**D.G., Mother,**
     Appellant,

**T.J., Father,**
     Appellant.

_____

Appeal from the Iowa District Court for Polk County, William J. Price, District Associate Judge.

A mother and father separately appeal the termination of their parental rights to their one-year-old son. **AFFIRMED ON BOTH APPEALS.**

Tammy Westhoff Gentry of Parrish, Kruidenier, Dunn, Boles, Gribble, Gentry, Brown & Bergmann, L.L.P., Des Moines, for appellant-mother.

Shane P. O'Toole, Des Moines, for appellant-biological father.

Bruce H. Stoltz Jr. of Stoltz & Updegraff, P.C., Des Moines, for legal father.

Thomas J. Miller, Attorney General, Kathrine S. Miller-Todd, Assistant Attorney General, John P. Sarcone, County Attorney, and Annette M. Taylor, Assistant County Attorney, for appellee.

Michael Bandstra, Des Moines, attorney and guardian ad litem for minor child.

Considered by Danilson, C.J., and Vogel and Tabor, JJ.

**TABOR, J.**

A father and mother separately appeal the termination of their parental rights to their one-year-old son, H.J. Both parents challenge the statutory grounds for the termination and the juvenile court's denial of an additional six months to work toward reunification under Iowa Code section 232.104(2)(b) (2013). The father individually contends the court also erred in not foregoing termination under sections 232.116(2) and (3). The mother individually contends the juvenile court erred in failing to order a second home study involving the maternal grandmother under the Interstate Compact on Placement of Children (ICPC). After reviewing the record and the parties' arguments, we reach the same conclusions as the juvenile court and affirm the termination order.

## I.    Background Facts and Proceedings

H.J.'s mother and father are Dawnielle and Toby. Dawnielle is married to Justin, with whom she had two older children, but H.J. was conceived while Justin was incarcerated.[1]

Dawnielle's two older children were adjudicated in need of assistance (CINA) in March 2013 because of their exposure to drugs and violence. In May 2013, Dawnielle began her relationship with H.J.'s father, Toby. The court was concerned by Toby's criminal history and directed Dawnielle to prohibit him from having contact with her children. When an investigator from the Iowa Department of Human Services (DHS) found drug paraphernalia in Dawnielle's

---

[1] Justin has been incarcerated for the entirety of these proceedings and is not a party to this appeal.

home and Toby hiding in a closet, the court ordered the two older children to be placed in the custody of their paternal great-grandmother.

In late 2013, Dawnielle became pregnant with H.J., but tried to keep the pregnancy a secret from the DHS. While pregnant, Dawnielle tested positive for marijuana. In January 2014, the juvenile court directed the State to initiate termination-of-parental-rights proceedings against Dawnielle and Justin regarding the two older children. But after an April 2014 hearing, the court elected not to terminate parental rights. Instead, the court gave the parents more time to reunify with the two older children.

H.J. was born in May 2014. The State filed a CINA petition for H.J. in June 2014 because his older half siblings were under the juvenile court's jurisdiction. The court adjudicated H.J. as a CINA in August 2014, but allowed him to remain in Dawnielle's care as part of the plan to transition the two older children back into her custody. Also in June 2014, a paternity test revealed Toby was H.J.'s biological father.

Dawnielle made progress in her parenting during the summer of 2014, so much so that by mid-August, the DHS was ready to return the older children to her custody. But before the older children could be returned, DHS required Dawnielle to provide a urinalysis. On August 20, 2014, Dawnielle appeared at the testing facility but left without providing a sample. She told the Family Safety, Risk, and Permanency (FSRP) worker she had to travel to Fort Dodge for a family funeral. The DHS instructed Dawnielle to apply a sweat patch the next

day to detect substance use. She claimed she could not do so because she did not have transportation back to Des Moines.

By August 22, the DHS learned the family member for whom Dawnielle claimed she was attending a funeral was not dead and had not seen Dawnielle in some time. That same day, concerned for H.J.'s safety, the court modified his placement from Dawnielle to DHS custody and set the matter for a hearing. As H.J.'s whereabouts were unknown, an Amber Alert was issued. Three days later, the DHS located H.J. at the home of Toby's parents in Coralville. The DHS placed H.J. in foster care in Polk County, but his parents remained in Iowa City for several months after the removal.

At the September 19 dispositional hearing, the court confirmed H.J. as a CINA and that placement outside the home was necessary because the parents were not engaging in services or addressing their substance abuse and mental health issues. Dawnielle requested a home study of H.J.'s maternal grandmother under the Interstate Compact on the Placement of Children (ICPC). The court denied the request because the grandmother recently had been the subject of an ICPC study in her home state of Tennessee during the CINA proceedings involved Dawnielle's two older children and Tennessee authorities determined she was not a suitable caretaker.

Throughout the course of these proceedings, both Toby and Dawnielle struggled with substance abuse. Both tested positive for methamphetamine, and Toby tested positive for marijuana. Both participated in treatment, but it was

sporadic and inconsistent. Dawnielle began mental health therapy in October 2014, but her attendance was also inconsistent.

Following H.J.'s removal, both parents were offered visitation, but it never progressed beyond supervised sessions. At first, Dawnielle regularly attended visits, and, for the most part, Toby did as well. But the parents' commitment waned. In January 2015, the parents attended only half of the scheduled visits. On February 5, 2015, the court terminated the parental rights of Dawnielle and Justin to the two older children. Later in February, the State filed a petition to terminate the rights of Dawnielle and Toby to their son H.J.

Three days before the termination hearing was scheduled to begin on March 30, 2015, Dawnielle cancelled the scheduled visit with H.J. because she was trying to end her relationship with Toby. On the weekend before the hearing, Toby reportedly injured Dawnielle by pushing her out of a moving car. The court entered a no-contact order prohibiting Toby from seeing Dawnielle. On April 4, Toby was arrested for violating that order.

The court held the termination hearing on March 30, March 31, and April 13. During the hearing, Dawnielle made another request for an ICPC home study of the maternal grandmother. The juvenile court declined to order another study. Following the hearing, on April 17, the court entered an order terminating Toby's parental rights under Iowa Code section 232.116(1)(h) and Dawnielle's rights under section 232.116(1)(g) and (h). The parents filed timely appeals.

**II.     Standards of Review**

We review termination proceedings de novo.  *In re A.M.*, 843 N.W.2d 100, 110 (Iowa 2014).  We will uphold an order terminating parental rights if the juvenile court's findings are supported by clear and convincing evidence.  *In re C.B.*, 611 N.W.2d 489, 492 (Iowa 2000).  Evidence is "clear and convincing" when a reviewing court has no serious or substantial doubts as to the correctness of the conclusions of law drawn from the proof.  *Id.*

We review the juvenile court's denial of a request for an ICPC home study under Iowa Code section 232.158 for an abuse of discretion.  *See In re C.E.*, No. 11-0897, 2011 WL 4953000, at *2 (Iowa Ct. App. Oct. 19, 2011) (citing *Donovan v. State*, 445 N.W.2d 763, 766 (Iowa 1989)).

**III.     Analysis**

**A. Statutory Ground for Terminating Toby's Parental Rights**

The juvenile court terminated Toby's rights under section 232.116(1)(h). He argues on appeal that under paragraph (h), if H.J. could be returned to one of the parents, the court should not terminate the rights of the other parent.  Our courts have rejected this argument.  *In re N.M.*, 491 N.W.2d 153, 155 (Iowa 1992).  Toby's rights would not be affected by the preservation of Dawnielle's rights.  Because Toby acknowledges he cannot resume H.J.'s care, we affirm the order terminating his parental rights under section 232.116(1)(h).

**B. Permissive Factors Weighing Against Termination**

Toby next claims the juvenile court failed to consider potentially mitigating factors in sections 232.116(2) and (3), but Toby only elaborates on subsection

(3)(c). Therefore, we will only consider paragraph (3)(c). *See EnviroGas, L.P. v. Cedar Rapids/Linn Cnty. Solid Waste Auth.*, 641 N.W.2d 776, 785 (Iowa 2002) (affirming random mention of an issue, without elaboration or supporting authority, is insufficient to raise issue).

Terminating the relationship between a parent and child may not be necessary if the court finds "clear and convincing evidence that the termination would be detrimental to the child at the time due to the closeness of the parent-child relationship." Iowa Code § 232.116(3)(c). This factor weighing against termination is permissive, not mandatory. *See In re D.S.*, 806 N.W.2d 458, 474-75 (Iowa Ct. App. 2011). We consider not only whether H.J. will be disadvantaged by the termination of his relationship with Toby, but whether the disadvantage overcomes Toby's inability to provide for H.J.'s developing needs. *See In re D.W.*, 791 N.W.2d 703, 709 (Iowa 2010).

We acknowledge evidence of a bond between Toby and H.J., as portrayed by the FSRP worker's March 12, 2015 report and Dawnielle's testimony from the termination hearing. While H.J. will likely suffer heartache from losing the connection to his father, the record shows that sting does not loom larger than Toby's inability to provide for H.J.'s developing needs.

As H.J. continues to grow and develop, his need for physical, mental, and emotional guidance will only become more challenging. In assessing Toby's capacity to manage these new challenges, "we gain insight into the child's prospects by reviewing evidence of the parent's past performance." *Id.* Toby has been involved with DHS over the last two years, but the services have not

enabled him to move to semi-supervised or unsupervised visits with H.J. Toby has committed acts of violence against H.J.'s mother, creating an unhealthy atmosphere for raising a child. Toby's limited improvement illustrates that any disadvantage H.J. suffers from termination does not overcome Toby's inability to provide for H.J.'s needs.

In his brief, Toby asserts he is no longer incarcerated or facing criminal charges, is pursuing drug treatment, and has secured a stable living environment. This information was not presented at the hearing and cannot be considered on appeal. "[A]ppellate courts cannot consider materials that were not before the district court when the court entered its judgment." *In re C.M.*, No. 10-1627, 2011 WL 1376618, at *2 n. 1 (Iowa Ct. App. April 13, 2011) (quoting *Alvarez v. I.B.P.*, 696 N.W.2d 1, 3 (Iowa 2005)); *see also* Iowa R. App. P. 6.801. If events occurring after the termination order issued are critical to a parent's position, the parent has the option of seeking a limited remand to make a record before the juvenile court. *See In re C.C.*, No. 09-1467, 2010 WL 2089349, at *1 (Iowa Ct. App. May 26, 2010) (ordering limited remand for purpose of determining whether mother's criminal charges had been resolved). The materials added to the record on limited remand would then be available for appellate consideration. Toby did not pursue that option. On our existing record, we conclude section 232.116(3)(c) did not require the juvenile court to refrain from terminating Toby's rights.

**C. Statutory Ground for Terminating Dawnielle's Parental Rights**

The juvenile court terminated Dawnielle's parental rights under sections 232.116(1)(g) and (h). To affirm, we are only required to find one ground supported by clear and convincing evidence. *See D.W.*, 791 N.W.2d at 706. Because we conclude termination of Dawnielle's rights under paragraph (h) was supported by clear and convincing evidence, we do not address her claims regarding paragraph (g).

Dawnielle contends H.J. can be safely returned to her care at the present time.[2] We disagree. We acknowledge Dawnielle has taken some steps toward addressing the barriers that prevent her from providing a safe and secure home for H.J., but her progress was limited.

The first concern remains Dawnielle's prolonged relationship with Toby because of his continued perpetration of domestic violence against her. We recognize it can be very difficult for a domestic violence victim to end an abusive relationship and Dawnielle's continued interaction with Toby is more likely a product of domestic violence dynamics than her conscious disregard of the inappropriateness of a partner. But our paramount consideration must be H.J.'s safety and well-being. Throughout this case and the CINA proceedings involving her older children, the DHS has offered Dawnielle services designed to assist with overcoming violent relationships, but Dawnielle's participation in these services has been inconsistent. While Dawnielle cannot be faulted for the

---

[2] "At the present time" means the time of the termination hearing. *A.M.*, 843 N.W.2d at 111.

violence, she has not fully embraced the support she needs to provide a safe environment for H.J.

The next concern is Dawnielle's unresolved substance abuse. Dawnielle tested positive for methamphetamine in January 2015. She did not enroll in substance abuse treatment until February 20, even though DHS had urged her to do so for several months. Dawnielle has not taken responsibility for the positive drug test, instead testified she does not recall taking methamphetamine because she was at a house party where she blacked out from too much alcohol. Dawnielle completed several treatment sessions between her February enrollment and the late March/early April termination hearing. She testified she was making progress. The juvenile court did not find her testimony credible because she failed to acknowledge using or having a substance abuse problem. We defer to the juvenile court's credibility finding.

In addition, Dawnielle's mental health issues present an impediment to reunification. She began weekly individual counseling sessions in October 2014. But from that start date through March 2015, Dawnielle only attended ten of eighteen scheduled sessions. Her therapist noted Dawnielle was moving toward accountability for her decisions, but little progress had been made due to the infrequency of her attendance.

Finally, we are apprehensive regarding Dawnielle's ability to provide a secure residence for H.J. The record indicates she would likely be losing her residence within days of the conclusion of the termination hearing due to unpaid bills and rent. She did not have a plan where she would move, and her only

solution to the problem was to get things worked out with her landlord. We are troubled at the prospect of sending a very young child into such an uncertain living arrangement.

The record shows by clear and convincing evidence that Dawnielle cannot provide a safe and secure home for H.J. because of her resistance to addressing her substance abuse, mental health, domestic violence, and housing issues. We affirm the termination of Dawnielle's parental rights under section 232.116(1)(h).

**D. Additional Time**

Both parents contend the juvenile court should have granted them a more time to work toward reunification with H.J. To afford parents an additional six months, section 232.104(2)(b) requires the court to determine "the need for removal of the child from the child's home will no longer exist at the end of the additional six-month period." We do not find that resolution to be likely in this case.

Neither parent has made sufficient progress toward addressing the many barriers toward reunification, including substance abuse, mental health problems, domestic violence, sustaining employment, inconsistent visitations, and maintaining a stable living situation. The parents' past behavior indicates giving them another six months will only delay the permanency to which H.J. is entitled. *See In re A.B.*, 815 N.W.2d 764, 778 (Iowa 2012) (explaining "e]vidence of the parent's past performance may be indicative of the quality of the future care that parent is capable of providing"). We affirm the juvenile court's denial of an additional six months.

**E. Second ICPC Study for the Maternal Grandmother**

In her final brief point, Dawnielle contends the juvenile court erred in its failure to order a second ICPC home study for H.J.'s maternal grandmother. Such home studies are governed by Iowa Code section 232.158. The purpose of the ICPC is for the participating states:

> to cooperate with each other in the interstate placement of children to the end that . . . [*inter alia*] [t]he appropriate authorities in a state where a child is to be placed may have full opportunity to ascertain the circumstances of the proposed placement . . . [and] [t]he proper authorities of the state from which the placement is made may obtain the most complete information on the basis of which to evaluate a projected placement before it is made.

§ 232.158(1)(b), (c). Subsection (3) enumerates the conditions for placement including subsection (3)(d), which reads:

> The child shall not be sent, brought, or caused to be sent or brought into the receiving state until the appropriate public authorities in the receiving state shall notify the sending agency, in writing, to the effect that the proposed placement does not appear to be contrary to the interests of the child.

To be approved for ICPC placement in Tennessee, the maternal grandmother's home state, the potential caretaker must complete a home study. The Tennessee Department of Child Services (DCS) will conduct interviews with the potential caretaker, assess the prospective home's environment for safety and risk, assess the quality of the potential caretaker's current and past relationships, and complete a background, medical, and criminal check on the potential caretaker. If the home study is unsuccessful, the potential caretaker

cannot be considered for placement under the ICPC. *See* Tennessee ICPC Practices and Procedures Manual.[3]

The maternal grandmother had an unsuccessful home study during the CINA case with the older two children. Dawnielle asked for a second home study at a dispositional hearing on September 19, 2014, and renewed that request at the terminating proceedings. On appeal, Dawnielle contends because a relative placement is preferred under chapter 232, the juvenile court erred in denying her requests.[4]

In reviewing the juvenile court's decision to deny a parent's request for an ICPC home study, we examine whether the denial was an appropriate exercise of discretion. Here, the juvenile court's denial was reasonable in light of the evidence in the record.[5] The grandmother was not approved by the Tennessee child services for placement of Dawnielle's older children. The record does not indicate the grandmother ever attended proceedings regarding H.J., and she has only had minimal contact with him. The grandmother did not testify or present any evidence that she was in a position to care for H.J. We have held that when the prospective ICPC study candidate has not actively participated in the

---

[3] The manual can be located at http://state.tn.us/youth/dcsguide/manuals.htm, last visited July 27, 2015.

[4] The guardian ad litem and State argue the home study issue was not was not preserved for appeal because Dawnielle did not file a written request with the juvenile court or provide the other parties with advance notice of her request. We opt to overlook any preservation problems and reach the merits of the issue.

[5] The record does not provide specific reasoning for the juvenile court's decision to deny either the ICPC request made at the September 19, 2014 hearing or the one made at the termination hearing. The record presented on appeal does not contain the transcript of the dispositional hearing where the juvenile court expressed its reasons for denying the first request and the juvenile court does not present a reason for declining to order a second study in its termination order.

proceedings or shown ability to be a suitable caretaker, it would be a waste of resources to initiate a home study. *See In re C.L.P.*, No. 12-0409, 2012 WL 1454007, at *3 (Iowa Ct. App. Apr. 25, 2012) (citing *In re C.B.*, 611 N.W.2d 489, 493 (Iowa 2000) ("The requirement of reasonable efforts exists both to protect rights of parents and children, and provide financial incentive for states")); *In re C.E.*, No. 11-0897, 2011 WL 4953000, at *3 (Iowa Ct. App. Oct. 19, 2011). Accordingly, we find the juvenile court did not err in denying Dawnielle's request for an additional home study.

## IV.    Conclusion

Clear and convincing evidence supports the termination order as to both parents' claims. Additionally, the juvenile court did not abuse its discretion in declining to order a second ICPC study for the maternal grandmother.

**AFFIRMED ON BOTH APPEALS.**

Danilson, C.J., concurs; Vogel, J., concurs specially.

**VOGEL, J.** (concurring specially)

While I concur with the court's decision to affirm the termination of Toby's and Dawnielle's parental rights to their son, I write separately to express my concern with the reference the majority makes to the failure of Toby to request a limited remand to show the progress he has made since the record was closed at the termination hearing. In support of this proclamation, the majority cites the unpublished case of *In re C.C.*, No. 09-1467, 2010 WL 2089349, at *1 (Iowa Ct. App. May 26, 2010). In that case, the juvenile court had denied the mother's request at the termination hearing for a permanency order granting her additional time so that the criminal charges against her could be resolved. *C.C.*, 2010 WL 2089349, at *1. Our court determined the request for the permanency order should have been granted and sua sponte ordered a limited remand so that on our review we would know whether the mother was convicted or acquitted—as the resolution would have a profound effect on the placement of the child. In the remand order, we specifically noted the mother was well on her way to regain custody of her son at the time she was incarcerated for a serious offense and that she was innocent until proven guilty. Our court ordered a limited remand so that the juvenile court could receive into evidence proof of the disposition of criminal charges. If at the time of the remand the charges had not been resolved, we directed the juvenile court to enter the requested permanency order.[6]

---

[6] This information was obtained from the remand order our court filed in the case and can be obtained from the Iowa Supreme Court Clerk's Office.

*C.C.* was a unique case where our court turned to its inherent power to order a limited remand because the determination of whether the child could be returned to the mother's care was highly dependent on whether the mother would be acquitted and able to resume her efforts to reunite with her son or convicted. If she was convicted, our court needed to know the terms of her sentence to know whether the child could or could not be returned to her care. Because of the pending nature of these critical factors, holding off on making a final determination of parental rights would have given the district court solid information as to the mother's availability to parent the child. *See In re M.M.*, 483 N.W.2d 812, 814 (Iowa 1992) (acknowledging that the "appellate court can, in limited circumstances, remand to supplement the record" but concluding the court of appeals should not have supplemented the record in the case at hand and limiting the further review to only the record made at the juvenile court).

Our appellate courts have severely limited the use of a limited remand as we have repeatedly voiced the need for children to have permanency without needless delay. *In re R.J.*, 436 N.W.2d 630, 636 (Iowa 1989) ("The crucial days of childhood cannot be suspended while parents experiment with ways to face up to their own problems. Neither will childhood await the wanderings of judicial process. The child will continue to grow, either in bad or unsettled conditions or in the improved and permanent shelter which ideally, at least, follows the conclusion of a juvenile proceeding."). In 1997 Congress enacted the Adoption and Safe Families Act, which "dramatically changed the manner in which this country treats children who have been removed from the care of their parents

and placed into foster care." *In re J.E.*, 723 N.W.2d 793, 801 (Iowa 2006) (Cady, J., concurring specially) (referencing the Adoption and Safe Families Act of 1997, Pub. L. No. 105-89, 111 Stat. 2115 (codified as amended in scattered sections of 42 U.S.C.)).

> Before 1997, child welfare laws—including Iowa's—focused on reuniting the family unit. Subsequently, and after Congress's enactment of the Adoptions and Safe Families Act of 1997 (ASFA), national and state child welfare laws emphasized the importance of timely providing children with appropriate custodial care.
> . . . The legislation sets firm deadlines for reunification, followed by prompt efforts to terminate parental rights if those deadlines are not met. ASFA's goals seek to prevent children from languishing in foster care by requiring parents to assume their parental responsibility quickly.
> . . . .
> . . . [O]ur response to ASFA has significantly, and not too subtly, identified a child's safety and his or her need for a permanent home as the defining elements in a child's best interests.

*Id.* at 801–02 (internal citations omitted). We have also enacted expedited rules of appellate procedure to further the goal of preventing children from languishing in foster care. *In re C.M.*, 652 N.W.2d 204, 208 (Iowa 2002) (noting the new appellate rules put into place to expedite appeals in termination cases were adopted in response to the Adoption and Safe Families Act of 1997 and its emphasis on timely permanency for children).

Cases since the 1997 ASFA permitting a limited remand are few and far between.[7] *See In re R.E.K.F.*, 698 N.W.2d 147, 149 (Iowa 2005) (granting the

---

[7] We do note there were a few cases prior to the ASFA of 1997 that permitted limited remands to take additional evidence. *See In re T.B.B.*, 460 N.W.2d 881, 881 (Iowa Ct. App. 1990) ("We ordered a limited remand of the case in order that the juvenile court could take additional evidence on several matters."); *In re T.W.W., Jr.*, 449 N.W.2d 103, 104 (Iowa Ct. App. 1989) (noting with displeasure the amount of time the case had

State's motion to strike exhibits attached to a further review brief that were not a part of the juvenile court record); *In re M.T.*, 613 N.W.2d 690, 693 (Iowa Ct. App. 2000) (ordering a limited remand so the State could amend its termination petition to include the correct Iowa Code section where the child turned four years old between the filing of the petition and the termination hearing).

In citing *C.C.* in this case and noting Toby failed to request a limited remand, the majority appears to signal to the bench and the bar that any parent may seek to reopen the termination record on appeal to make posttrial assertions of progress on any front, whether it be mental health, drug or alcohol treatment, housing, employment, or compliance with any of the recommended services. This would violate the purpose of the timeline in our statutory framework, which the legislature put in place to adhere to federal regulations, permitting parents a certain amount of time to address concerns regarding the safety and care of the child at issue. *See In re J.E.*, 723 N.W.2d at 801–02 (noting that our response to the AFSA has changed our approach in termination proceedings from focusing on reuniting a family to focusing on the child's need for a permanent home). The timeframes are in the statute in order to ensure the child has stability and permanency in his life, certainly not to grant parents an opportunity to reopen the record, in defiance to the statutory time they have already been allowed. *See In re C.B.*, 611 N.W.2d 489, 495 (Iowa 2000) ("Time is a critical element.").

---

languished and stating the children had a lessened chance for a successful adoption the longer they stayed in the system but ordering a limited remand to the trial court "for the limited purpose of enabling the trial court to take additional evidence as to the mother's current situation.").

> While we recognize the law requires a "full measure of patience with troubled parents who attempt to remedy a lack of parenting skills," Iowa has built this patience into the statutory scheme of Iowa Code chapter 232. . . . The purpose of these limitations "is to prevent children from being perpetually kept in foster care and to see that some type of permanent situation is provided for the children."
>
> Once the limitation period lapses, termination proceedings must be viewed with a sense of urgency.

*Id.* at 494–95 (internal citations omitted); *see also In re A.C.*, 415 N.W.2d 609, 613 (Iowa 1987) (noting that "beyond the parameters of chapter 232, patience with parents can soon translate into intolerable hardship for their children"). When the statutory time has passed, the issue of whether the parents are suitable to have the child returned to their care is ripe for a determination, and we should not permit the parents to offer evidence of their attempts to fix their deficiencies after the termination hearing. *In re A.B.*, 815 N.W.2d 764, 777 (Iowa 2012) ("It is well-settled law that we cannot deprive a child of permanency after the State has proved a ground for termination under section 232.116(1) by hoping someday a parent will learn to be a parent and be able to provide a stable home for the child."). To permit evidentiary additions to the record posttermination hearing threatens the finality of the order and keeps the children at issue in limbo.

Therefore, I disagree with the majority that parents should be able to seek a limited remand in order to offer evidence of their progress posttermination. In all other respects, I agree with the majority's decision in this case.